UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

EDWARD LAMONT                       :
    Plaintiff,                      :
                                    :          CIVIL ACTION NO.
    v.                              :          3:10CV1364 (HBF)
                                    :
BRIAN K. MURPHY et al               :
    Defendants.                     :
                                    :

BENCH RULING

Plaintiff Edward Lamont ("Lamont") brings this civil rights action pursuant to 42 U.S.C. § 1983, alleging that defendants violated his Eighth Amendment right to be free from cruel and unusual punishment by denying him a meaningful opportunity for recreation. Plaintiff's constitutional claim arises out of a Department of Corrections policy change in September 2009 that required inmates in Phase I of the Security Risk Group Safety Threat Member ("SRGSTM") program at Northern Correctional Institute ("Northern"), to wear handcuffs during their recreation period.  During the time period giving rise to plaintiff's allegations, defendant Angel Quiros was the Warden at Northern, Michael LaJoie was the Department of Corrections District Administrator, and Brian Murphy was the interim Acting Commissioner for the Department of Corrections.

Plaintiff seeks injunctive and declaratory relief in addition to an award of nominal and punitive damages.  A court

1

trial was held March 13, 14, 15, 16 and 19, 2012.[1] At trial, plaintiff testified on his own behalf and also presented the testimony of inmate Chauncey Sturdivent; inmate Rayquan Stokely; Michael LaJoie, District Administrator; Captain Gerald Hines; Andrew Cameron, correctional recreational supervisor at Northern; Angel Quiros[2], District Administrator; Dr. Suzanne Ducate; and the expert testimony of Douglas Baumgarten, an expert in exercise science. [doc. #60, Pl.'s Witness List]. Defendants further offered the testimony of Brian Murphy, retired Acting Commissioner of the Department of Corrections; John Aldi, Counselor Supervisor and Security Risk Group coordinator; Captain Butkiewiez, SRGSTM Phase I unit manager; and the expert testimony of Dr. Suzanne Ducate, director of psych services and principal psychiatrist for the Department of Corrections, and an expert in correctional medicine. The testimony and evidence adduced at the trial are summarized below as necessary to explain the Court's findings and conclusions. For the reasons that follow, the Court enters judgment in favor of the defendants.

---

[1] Given the similarity in claims, this case was tried in conjunction with the case, Taylor v. Murphy, 10cv245 (HBF). Plaintiffs Taylor and Lamont were both ably represented by pro bono counsel, Attorney Robert Mitchell. Defendants in both cases were represented by Assistant Attorney General Ann Lynch and Steven Strom.  Following the presentation of evidence in the Taylor case, the Court granted the parties' motion to incorporate all exhibits and testimony from the Taylor case into the Lamont case.

[2] Mr. Quiros testified by deposition. [Pl.'s Ex. 7].

I.   <u>FINDINGS OF FACT</u>

   *A. THE SECURITY RISK GROUP SAFETY THREAT MEMBER PROGRAM*

1.   Northern is a level 5 maximum level security institution,
housing  inmates on death row, gang threat program inmates,
inmates with chronic discipline, and inmates who have
demonstrated a serious inability to adjust to confinement, posing
a threat to the safety and security of the community, staff and
other inmates.

2.   The SRGSTM program at Northern was created in the 1990s[3] and
designed for inmates who have been incarcerated and designated by
DOC as gang members and threats to the general prison population.

3.   The SRGSTM program differs from the Administrative
Segregation program in that it is based on historical
perspectives and focuses on inmates who have been designated gang
members and are engaging in gang activity.

4.   An inmate is placed in the SRGSTM Program if, among other
things, the DOC has evidence that the inmate is involved in
committing a crime or carrying out a hit against another gang
member.

5.   Since its inception, the SRGSTM program has had three
phases, which must be successfully completed by the inmate before
he reintegrates into general population.

---

[3] LaJoie believes the program began in 1993.

6.   In general, an inmate remains in Phase I of the SRGSTM program for 120 days.

7.   This period may change depending upon an inmate's behavior or disciplinary history.

8.   Phase I SRGSTM inmates recreate in the prison recreation yard in groups of 8.

9.   Phase I of the SRGSTM is described as a "cooling down" period where the inmate, for a minimum period of four months, is given an opportunity to calm down and get away from the pressure of general population.

10.   Inmates in Phase I of the SRGSTM program may only live or recreate with inmates who are in the same gang or are members of a compatible gang.

11.   Prior to October 2009, inmates in the SRGSTM Phase I program recreated for one hour, five times a week, with other inmates in groups of approximately 6-8 inmates.

12.   Prior to October 2009, SRGSTM Phase I inmates were permitted to recreate without any restraints, i.e., leg irons, tethers or handcuffs.

13.   With very rare exceptions, SRGSTM Phase I inmates are not in leg irons or belly or tether chains during recreation.

14.   Inmates who successfully complete SRGSTM Phase I transition into SRGSTM Phase II, which lasts a minimum of ninety days.

15.   Phase II is a period when the inmates continue to settle down and begin to interact with other inmates. As in Phase I, inmates are permitted to recreate in the recreation yard for one hour a day, five times a week.

16.   Phase III, the final phase of the program, is meant to simulate general population.

17.   Inmates in Phase II and Phase III are allowed to recreate without handcuffs.

18.   In all phases of the SRGSTM program, inmates are allowed to exercise in their cells.

19.   On or about October 5, 2009, the recreation policy changed, requiring SRGSTM Phase I inmates to recreate in handcuffs.[4]

*B. LAMONT'S BACKGROUND*

20.   Lamont is serving a 62-year sentence for various offenses including murder, assault, reckless endangerment and carrying a pistol without a permit.

21.   In 2002, the Department of Corrections first designated Lamont as a member of the Bloods gang.

22.   When asked if he was a member of the Bloods, Lamont invoked his fifth amendment privilege against self-incrimination.

23.   Plaintiff has tattoos on his body with Blood signs.

---

[4] At first, the policy change required SRGSTM Phase I inmates to be handcuffed in the front; in January 2010, the policy changed, requiring Phase I SRGSTM inmates to be handcuffed behind the back. [Def.'s Ex. 524a-c].

24.   In 2008, a letter written by Lamont was found in another inmate's property. The letter discussed gang status and that the Blood oath required members to hate their enemies.

25.   As a result of the letter, in 2008, Lamont was designated as a Security Risk Group Safety Threat member. [Def.'s Ex. 509].

26.   Plaintiff had a hearing at which he appeared and did not deny writing the letter.

27.   Plaintiff is familiar with the phrase "Blood in, Blood out", which means that to leave the Bloods gang an inmate needs to shed some blood.

28.   Plaintiff was in the SRGSTM phase I program from November 20, 2009 to May 18, 2010.

*C. SRGSTM PHASE I ASSAULTS PRIOR TO OCTOBER 2009*

29.   Although SRGSTM Phase I inmates only live or recreate with inmates who are in the same gang or are members of a compatible gang, there were numerous fights and/or assaults in 2009, prior to October 5, 2009.

30.   The Court credits the testimony of Captain Butkiewiez and District Administrator LaJoie that in 2009 there was an increase in assaults among inmates and toward staff members, as reflected in the Incident Summary report for SRGSTM Phase I at Northern. [Def.'s Ex. 504c]. The increase in assaults among the SRGSTM

Phase I inmates precipitated the change in the restraint policy at issue.

31.  On January 2, 2009, there was a fight in recreation yard between two SRGSTM Phase I inmates necessitating the use of a chemical agent.

32.  On March 9, 2009, there was a fight in the recreation yard involving four SRGSTM Phase I inmates. Officer Chapman injured his right wrist when he inadvertently hit a wall while running to answer the code call.

33.  On April 3, 2009, there was fight in the recreation yard when two SRGSTM Phase I inmates assaulted another SRGSTM Phase I inmate, necessitating the use of a chemical agent.

34.  On May 4, 2009, there was a fight in the recreation yard between two SRGSTM Phase I inmates.

35.  On May 26, 2009, there was a fight in the recreation yard involving nine SRGSTM Phase I inmates, necessitating the use of chemical agent.  Officer Diaz inadvertently got capstun to his eyes.

36.  On June 1, 2009, there was an inmate fight in the recreation yard between two SRGSTM Phase I inmates, necessitating the use of a chemical agent.

37.  On June 4, 2009, there was a fight in the recreation yard among three SRGSTM Phase I inmates.

38.  On July 16, 2009, there was a fight in the recreation yard
between two SRGSTM Phase I inmates.  Blood splattered on a
correctional officer.

39.  On August 12, 2009, one SRGSTM Phase I inmate attempted to
assault another SRGSTM Phase I inmate by rushing toward him and
trying to strike him with his fists.

40.  On August 30, 2009, one SRGSTM Phase I inmate began to
assault another inmate in the multi-purpose room.

41.  On September 18, 2009, Correctional Officer Harrison was
seriously assaulted by two SRGSTM Phase I inmates after he
returned one of the unrestrained SRGSTM Phase I inmates to his
cell.  This inmate's cellmate threw soup into C/O Harrison's face
and then both inmates began punching and kicking him.  C/O
Harrison could do nothing but curl up in a fetal position.  Both
inmates then resisted responding staff.  [Def.'s Ex. 505,
incident report and nice vision footage of incident].

42.  Although the incident involving Officer Harrison, which led
to the restraint policy, took place on the tier, not in the
recreation yard, the Court credits Captain Butkiewiez's testimony
that anytime an inmate is unrestrained, the safety and security
of the staff and other inmates is compromised.

43.  The unpredictability, frequency and seriousness of these
assaults and fights is a reason, defendants contend, that for the

safety and well-being of both staff and inmates, something needed to be done immediately.

44.  Plaintiff was not a participant in any of the fights or assaults that took place in the recreation yard in 2009.


D. *PROCESS THROUGH WHICH RECREATION POLICY WAS REVIEWED AND CHANGED*

45.  Following the multiple assaults in 2009, Brian Murphy, interim DOC commissioner, called a meeting to discuss the safety concerns about the SRGSTM program.

46.  Murphy testified that, "the frequency and amount of violence was unacceptable. I thought we had a serious problem and needed to be proactive about it."

47.  Murphy formed a committee, headed by Michael LaJoie, North District Administrator, to review the problems and present recommendations.

48.  LaJoie testified that the recreation restraint policy for SRGSTM Phase I needed to be changed because, "Doing nothing wasn't an option". Murphy agreed that keeping no-restraint recreation was not an option because they needed safety and security.

49.  Regarding the policy change, Murphy testified that he wanted to try to use the least restrictive methods to accomplish the task, but Northern is where the most dangerous inmates are

housed. He said he did not want to eliminate the right to recreate altogether in Phase I and wanted to use the least restrictive means to accomplish the goals. Murphy was aware that the Eighth Amendment provides a right to recreate.

50.  Murphy, LaJoie, Quiros and the rest of the committee considered the following options: no recreation; recreation cages; individual recreation; no restraints; some inmates in restraints and some inmates unrestrained; and restraints.

51.  The DOC decided against recreation cages because they lacked the time or money to implement, and recreation cages were part of the Administrative Segregation program, which was meant to be more restrictive than SRGSTM.  Moreover, cages were rejected because the staff wanted to allow the inmates to socialize in order to collect intelligence and to watch inmates interact with each other.

52.  The DOC decided against individual recreation because there would not be enough time in the day to recreate all the inmates.

53.  The DOC decided against eliminating recreation.

54.  The DOC decided against having some inmates restrained and others unrestrained, because individual determinations regarding recreation would undermine the DOC's motto of being "Firm, Fair and Consistent".

55.  On September 25, 2009, Warden Quiros circulated a memo to Deputy Commissioner Mark Strange, with a copy to Michael LaJoie,

outlining the proposed corrective changes. Among other changes, it recommended that,

> All inmates classified as SRGSTM, phase 1 inmate shall be handcuffed behind the back for all out of cell activity. The exceptions to this are legal visits, legal phone calls and social phone calls. For these exceptions, the inmate will be handcuffed in the front. [Def.'s Ex. 514].

56. On October 1, 2009, Quiros authored a memo to Deputy Commissioner Strange, with a copy to LaJoie, setting forth the adopted policy changes. Quiros stated:

> As requested, the following is an action plan to implement the new policy changes for the Security Risk Group Safety Threat Member Program at Northern. These policy changes and [sic] been reviewed and approved by Assistant Attorney General Terry O'Neil.
>
> All Inmates classified as SRGSTM, phase 1 inmate shall be handcuffed behind the back for all out of cell activity. The exceptions to this are legal visits, legal phone calls, inmate court yard recreation and social phone calls. For these exceptions, the inmate will be handcuffed in the front.

[Def.'s Ex. 515].

57. Ultimately after considering all the options, including the fact that Phase I was for a short period of time and the fact that inmates routinely exercise in their cells, it was decided that as of October 5, 2009, SRGSTM Phase I inmates would recreate in handcuffs in the front. [Def.'s Ex. 512]

58. When the restraint policy for Phase I inmates was changed in October 2009, the defendants agreed that meaningful exercise was accomplished by moving the inmate outside of the cell, having the

inmate be with the elements, move their feet, get some sun, walk around and get some exercise, and enjoy the open space, in addition to the fact that inmates were allowed to exercise in their cells.

59.  On January 6, 2010, two SRGSTM Phase I inmates, on their way to recreation and handcuffed in the front, assaulted Officers Jones and Guimond. Both officers were struck on their heads with handcuffs. Numerous staff were injured. [Def.'s Ex. 506a-b, incident report and nice vision footage of incident].

60.  Effective January 14, 2010, following a memo from Quiros to LaJoie, SRGSTM Phase I inmates recreated in the yard handcuffed behind the back. [Def.'s Ex. 524a-c].


 *E. SRGSTM PROGRAM AND LAMONT*

61.  Lamont went into SRGSTM Phase I from November 20, 2009 through May 18, 2010 (six months).

62.  Prior to entering the SRGSTM program, Lamont was in the Administrative Segregation program at Northern after he covered his cell window, along with several other inmates who had been designated Blood members, and officers had to go from cell to cell to remove the inmates from their cells.

63.  While in Administrative Segregation, Lamont's cell mate was Stokely.

64.  For purposes of this case, the relevant time period is November 2009 through May 2010, the period during which Lamont, a SRGSTM Phase I inmate at Northern, was subjected to the recreation restraint policy.

65.  By the time Lamont entered SRGSTM Phase I, the recreation restraint policy had been changed to require inmates to recreate in handcuffs.

66.  During the entire time that plaintiff was in SRGSTM Phase I, plaintiff was in a cell approximately 7 feet wide by 12 feet long, with two narrow bunk beds 30 inches wide by 79 inches long, a desk 16 inches wide by 36 inches long, a sink/toilet area, the sink being 28 inches wide by 13 inches deep with the toilet extending out by 24 inches.  Within the cell, defendants allege that plaintiff had sufficient room to perform exercises or calisthenics such as jumping, running in place, push-ups or sit-ups.

67.  During SRGSTM Phase I, Lamont had six or seven different cell mates.

68.  Plaintiff never recreated in belly chains or leg irons while a SRGSTM Phase I inmate.

69.  Plaintiff performed push-ups, sit ups and squats in his cell.

70.   In addition to in-cell exercise, during the time that Lamont was in SRGSTM Phase I, he was allowed to walk in the outside recreation yard, albeit in handcuffs, for 5 hours per week.

F. JUSTIFICATION FOR AND EFFECT OF THE SRGSTM PHASE I RECREATION
   RESTRAINT POLICY

71.   It is the professional opinion of defendants that the decrease in the number of inmate fights in the recreation yards is directly attributable to the policy requiring that SRGSTM Phase I inmates recreate in handcuffs.

72.   Any time there is an inmate fight, safety and security of the correctional facility is adversely affected.

73.   Inmates in the recreation yard who are assaulted or engage in a fight are at risk of getting injured.

74.   Staff must break up an inmate fight and thus are also at risk of being injured.

75.   In the past, staff has been injured while responding to inmate fights.

76.   Riots or disturbances are often started by inmate fights.

77.   Any time there is a major riot or disturbance at a correctional facility, the safety and security of the general public is threatened as hostages can be taken and escapes can occur.

14

78.  Plaintiff concedes that the number of fights occurring during recreation in SRGSTM Phase I has decreased since inmates have been restrained during recreation.

*G. OPPORTUNITIES FOR EXERCISE*

79.  Even in restraints, plaintiff and other SRGSTM Phase I inmates could walk in the recreation yard.

80.  Plaintiff's expert in exercise science, Douglas Baumgarten, testified that, even restrained behind the back, an inmate could walk at the pace of 3.5 miles an hour.

81.  Chauncey Sturdivent, a witness for the plaintiff, testified that during SRGSTM Phase I he would run in place, do push-ups, jumping jacks, burpees and crunches in his cell.

82.  Rayquan Stokely, a witness for the plaintiff and Lamont's former cellmate, testified that SRGSTM inmates would do group exercises in their cells, where one inmate would yell out an exercise and all would do the exercises in unison.

83.  As confirmed by Stokely and Sturdivent, plaintiff's witnesses, other inmates exercise regularly in similar sized cells, doing push-ups and sit-ups.

84.  Lamont testified that while in Administrative Segregation he worked out with Stokely in his cell doing, among other things, burpees, mountain climbers and push-ups.

85.   Lamont and Sturdivent both testified that Lamont gave Sturdivent examples of exercises Sturdivent could perform.

86.   Sturdivent testified that Lamont had more muscles than other inmates.

87.   There is no evidence of any inmate being assaulted or retaliated against during the SRGSTM program for doing in-cell exercise.

88.   Defendants introduced videos of Officer McCormack performing various exercises, such as running in place, squat thrusts and jumping jacks, in different cells.  [Def.'s Exs. 507a-d].

89.   The videos were taken at Northern in a west side cell similar to Lamont's cell.

90.   In order to film these videos, the entire west unit was evacuated through a fire drill, decreasing the typical level of noise in the unit.

91.   The noise produced by exercising is greatest for the cell beneath the cell where the exercises are being done. [Def.'s Ex. 507b].

92.   The Court credits the testimony of Dr. Ducate, an expert in correctional medicine, that plaintiff can do calisthenics in his cell, such as lunges, jumping jacks, sit-ups, crunches, push-ups, squats, and running in place, which, when alternated rapidly, can provide significant cardiovascular benefits.

93.   The Court credits the testimony of Dr. Ducate that navy submarine officers who are confined to small spaces, akin to a prison cell, are able to stay in shape by performing a series of calisthenics, as reflected in Def.'s Ex. 520, a Submarine Series-Level 1 and 2, Navy Operational Fitness Series.

94.   The Court credits the testimony of Dr. Ducate that, to a reasonable degree of medical certainty, plaintiff had a meaningful opportunity to exercise.

95.   The Court credits the testimony of Dr. Ducate that there is no evidence to indicate that plaintiff had any mental health problems because of a lack of exercise.

96.   The Court credits the testimony of Dr. Ducate that there is no evidence that recreating in handcuffs caused plaintiff to suffer any physical or mental health injuries.


II.   DISCUSSION

Plaintiff alleges that defendants violated his constitutional rights under the Eighth Amendment to the United States Constitution by depriving him of the opportunity for meaningful recreation. The question before this Court is whether plaintiff has sustained his burden of proof on this claim. For the reasons that follow, the Court concludes that plaintiff has failed to sustain his burden of proof and finds in favor of the defendants.

*Eighth Amendment*

"It is undisputed that the treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment."  Helling v. McKinney, 509 U.S. 25, 31 (1993); see also Rhodes v. Chapman, 452 U.S. 337, 351 (1981).  To prevail on an Eighth Amendment claim, an inmate must provide evidence demonstrating the failure of prison officials to provide for inmates' "basic human needs-e.g., food, clothing, shelter, medical care, and reasonable safety." DeShaney v. Winnebago County Dept. of Social Servs., 489 U.S. 189, 200 (1989).  An inmate may prevail on an Eighth Amendment claim only where he proves both an objective element and a subjective element. Farmer v. Brennan, 511 U.S. 825, 834 (1994); Jolly v. Coughlin, 76 F.3d 468, 480 (2d Cir. 1996).

To satisfy the objective element, a "plaintiff must demonstrate that the conditions of his confinement result 'in unquestioned and serious deprivations of basic human needs.'" i.e. violating contemporary standards of decency. Jolly, 76 F.3d at 480 (quoting Anderson v. Coughlin, 757 F.2d 33, 35 (2d Cir. 1985)). "A court faced with the task of determining whether a particular deprivation falls below the objective requirements of the Eighth Amendment should consider (1) the duration of the deprivation; (2) the extent of the deprivation; (3) the availability of other out-of-cell activities; (4) the opportunity

18

for in-cell exercise; and (5) the justification for the
deprivation." Williams v. Goord, 142 F. Supp. 2d 416, 425
(S.D.N.Y. 2001) (citations omitted).

The subjective element requires a plaintiff to show that
the prison official acted with a "sufficiently culpable state of
mind", i.e., with "deliberate indifference to inmate health or
safety." Farmer, 511 U.S. at 834 (citations omitted).

*Denial of Recreation*

Both the Supreme Court and the Court of Appeals for the
Second Circuit have acknowledged that exercise is a basic human
need that must be provided for inmates. See Wilson v. Seiter,
501 U.S. 294, 304-05 (1991); Williams v. Greifinger, 97 F.3d 699,
704 (2d Cir. 1996); Sostre v. McGinnis, 442 F.2d 178, 193 & n.25
(2d Cir. 1971). Restrictions on exercise should not be
"routine." Restrictions must be limited to unusual circumstances
or situations where restrictions are needed for disciplinary
reasons. See Hope v. Pelzer, 536 U.S. 730, 737 (2002) (noting
that penological concerns may be considered in reviewing an
Eighth Amendment claim); Bell v. Wolfish, 441 U.S. 520, 547
(1979) ("the problems that arise in the day-to day operation of a
corrections facility are not susceptible of easy solutions.
Prison administrators therefore should be accorded wide-ranging
deference in the adoption and execution of policies and practices

that in their judgment are needed to preserve internal order and discipline and to maintain institutional security").

While courts have found that denial of all opportunity to exercise violates an inmate's constitutional rights, they have found no violation where the inmate has some opportunity for exercise, either in or outside of his cell. Indeed, the issue has been litigated in this Court for decades. Recently, Judge Droney in Shakur v. Sieminski, Civ. No. 3:07cv1239 (CRD), 2009 WL 2151174 (D. Conn. July 15, 2009), in granting defendant summary judgment held that plaintiff's right to recreate was not violated where, "there is sufficient room for Shakur to perform calisthenics, run in place or do sit-ups or push-ups. . . in his cell". Similarly, in Morgan v. Rowland, Civ. No. 3:01cv1107 (CRD), 2006 WL 695813, at *7 (D. Conn. March 17, 2006), the Court found that plaintiff, a Phase I Administrative Segregation inmate at Northern, who was in full restraints during his outdoor recreation did not suffer a constitutional violation given that he had sufficient room in cell to perform calisthenics. In Dawes v. Coughlin, 964 F. Supp. 652 (N.D.N.Y. 1997), aff'd, 159 F.3d 1346 (2d Cir. 1998), the Court held that requiring an inmate to recreate in full restraints pursuant to a restraint order issued for safety and security reasons did not violate inmate's Eighth Amendment rights where inmate was able to move around in recreation area.

20

With these principles in mind, the Court turns to the record before it.

### 1. OBJECTIVE ELEMENT

With regard to the objective element, the Court considers factors including the duration and extent of the deprivation, the availability of other out-of-cell activities, the opportunity for in-cell exercise and the reason for the deprivation. Williams v. Goord, 142 F. Supp. 2d, at 425.

(1)   *Duration of the deprivation*

The evidence shows that SRGSTM Phase I was meant to be of limited duration and a cooling down period, lasting 120 to 180 days. The evidence further established that transition to Phase II of the program, where recreation was less restricted, was voluntary and depended on the inmate's willingness to subscribe to the program's philosophy. Mr. Quiros testified that, "[l]ack of motivation in the program poor attitude in the program, intelligence that we have gathered of still engaging in gang activity could prevent or prolong the stay." [Quiros depo. at 53].

Mr. Lamont stayed in Phase I for six months before transitioning to Phase II, where inmates are allowed to recreate without handcuffs. Mr. Lamont's transition through Phase I was within the DOC's estimated amount of time for that phase. Therefore, the Court finds that the duration of Mr. Lamont's time

in SRGSTM Phase I, during which he was subject to the restraint policy, was not unreasonable.

(2)  *The extent of the deprivation*

The record is uncontroverted that the change in the recreation restraint policy limited plaintiff's ability to do certain exercises and engage in certain activities while recreating in the yard. Without handcuffs, plaintiff and other inmates could use the outdoor recreation yard to play handball, jog or run vigorously, do push-ups and other calisthenics. With handcuffs, the plaintiff and other inmates were limited to walking around and talking with other inmates.

The Court credits the testimony of plaintiff's expert in exercise science that even with handcuffs behind the back, a person could safely walk at a speed of 3.5 miles an hour. Moreover, the Court credits the defendants' testimony that the recreation restraint policy did not interfere with plaintiff's opportunity to breathe fresh air, be exposed to direct sunlight, socialize with other inmates, walk around, and have a change of activity in a day that was spent mostly in the a cell.

Further, the Court credits the testimony of Dr. Ducate, an expert on correctional medicine familiar with the plaintiff's health, that (1) there is no evidence that plaintiff suffered any mental health problems because of a lack of exercise, and (2) there is no evidence that recreating in handcuffs caused

plaintiff to suffer any physical or mental health injuries. In fact, Dr. Ducate also testified that Mr. Lamont was a very healthy individual whose BMI was normal during the SRGSTM period.

The Court finds that the extent of the deprivation, in light of the purpose and limited duration of SRGSTM Phase I and the security concerns of the facility, was not objectively unreasonable.

(3) *The availability of other out of cell activities*

There is no dispute that SRGSTM Phase I was very restrictive, with limited activities or programming. Generally, an SRGSTM Phase I inmate was allowed one hour of recreation daily, Monday through Friday; three 15-minute showers a week, three 15-minute telephone calls and, if necessary, medical, social and legal visits. LaJoie testified that all meals were in the cell and there was no educational programming during Phase I.

The program was designed to make opportunities for out of cell activities during SRGSTM Phase I extremely limited. However, the Court finds that recreation for one hour, five times a week, outdoors, even in handcuffs, provided plaintiff and other inmates many benefits, including the opportunity to breathe fresh air and have exposure to direct sunlight, to talk and socialize with other inmates, to walk around, to stretch their legs, and to enjoy the more open space.

23

(4)  *The opportunity for in-cell exercise*

The Court finds that plaintiff had the opportunity to meaningfully exercise in his cell. In arriving at this conclusion, the Court relies on evidence that inmates were permitted to exercise in their cells, plaintiff's testimony that he performed exercises in his cell, the testimony of inmates Sturdivent and Stokely regarding their in-cell exercise routine, the videos [ex. 507a-d] that show Officer McCormack performing push-ups, sit-ups, jumping jacks, squat thrusters and running in place, and Dr. Ducate's expert testimony that plaintiff could meaningfully exercise in his cell.

Mr. Lamont testified that during SRGSTM Phase I, he exercised in his cell, performing push-ups, sit-ups and pull-ups, and that he would go outside to recreate to get fresh air, interact with other inmates and walk. Stokely and Sturdivent both testified that during SRGSTM Phase I and in other programs, they and other inmates exercised in their cells. Stokely testified that while in Administrative Segregation unit, whose cells are similar to the SRGSTM cells, he would do push-ups, pull-ups, sit-ups, burpees, about three times a week for an average of 90 minutes with his roommate Lamont.  The Court credits Mr. Stokely's testimony that sometimes SRGSTM inmates would do group

exercises, yelling out the exercise to be done and performing them in unison. This was confirmed by Warden Quiros.

The videos made and introduced by defendants reveal that (1) Officer McCormack had sufficient space in the cell to undertake these rigorous exercises; (2) the noise made from the exercises was not significant, and (3) Officer McCormack worked up a sweat during the short time he undertook the exercises.

The Court assigns considerable weight to the testimony of Dr. Ducate, an expert in correctional medicine, who knows the plaintiff and is very familiar with his conditions of confinement. As stated above, Dr. Ducate testified that plaintiff can do calisthenics in his cell which, if alternated rapidly, can provide significant cardiovascular benefits. She also gave compelling examples of submarine officers in the Navy who, confined to small spaces, are able to maintain an adequate level of fitness by performing a series of calisthenics, as reflected in Def.'s Ex. 520, a Submarine Series- Level 1 and 2, Navy Operational Fitness Series.

Finally, the Court rejects the assertion that plaintiff was deterred from doing exercise in his cell, due to fear of retaliation from other inmates because of noise or other nuisance caused by the exercise. Mr. Lamont testified that depending on where you were located, an inmate below would knock on the ceiling complaining of noise. Other than this general comment,

there is no evidence that Mr. Lamont was prohibited or deterred from exercising in his cell, or that he changed his in-cell routine out of fear of retaliation. Mr. Stokely testified that in 2007, when he was in the Security Risk Group, a fight broke out in the recreation yard because of exercise done in the recreation yard, but that this did not cause him to change his in-cell exercising routine.

(5)   *The justification for the deprivation*

The Court finds that the record overwhelmingly supports as valid the proffered justification for the change in the SRGSTM Phase I recreation restraint policy. The evidence shows that the policy was put into place to enhance safety and security at Northern for the inmates and the prison staff following a number of emergencies in 2009. As previously described, as early as January 2009, a fight broke out in recreation yard between two SRGSTM phase I inmates. This incident was followed by a series of fights in the recreation yard involving SRGSTM Phase I inmates on March 9, April 3, May 4, May 26, June 4, and July 16, 2009, and assaults on staff, including the September 18, 2009 incident where Correctional Officer Harrison was seriously assaulted by two SRGSTM Phase I inmates after he returned one of the unrestrained SRGSTM Phase I inmates to his cell. In fact, Lamont admitted that he witnessed two assaults in the recreation yard.

The Court credits the testimony of defendants Quiros, LaJoie and Murphy that the safety and security of inmates and staff was a paramount concern, prompting the review and ultimate changes to the recreation restraint policy. The Court also credits the defendants' testimony that other less restrictive options were considered, but ultimately rejected because they were impractical, too costly or unsafe. The Court finds that the increase in violent incidents involving SRGSTM Phase I inmates in 2009 was adequate justification for the change in the recreation restraint policy.

Weighing the five factors, the Court concludes that plaintiff has failed to meet his burden of demonstrating that the policy of recreating SRGSTM Phase I inmates in the recreation yard in handcuffs violated contemporary standards of decency or the Eighth Amendment.

### 2. SUBJECTIVE ELEMENT

The subjective element of an Eighth Amendment claim requires plaintiff to show that the defendants acted with a "sufficiently culpable state of mind", i.e., with "deliberate indifference to inmate health or safety." Farmer, 511 U.S. at 834, 114 S.Ct. 1970 (quoting Wilson v. Seiter, 501 U.S. 294, 297, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991)); Salahuddin v. Goord, 467 F.3d 263 (2d Cir. 2006). "Deliberate indifference is a mental state equivalent to subjective recklessness, as the term is used in

criminal law." Salahuddin, 467 F.3d at 280 (citing Farmer, 511
U.S. at 839-40, 114 S.Ct. 1970). Here, plaintiff has failed to
meet his burden.

The Court finds that defendants sincerely believed that
changing the restraint policy was necessary to protect inmate and
staff safety. See Salahuddin, 467 F.3d at 280 ("The defendant's
belief that his conduct poses no risk of serious harm (or an
insubstantial risk of serious harm) need not be sound so long as
it is sincere."). Plaintiff introduced no evidence from which the
Court could conclude that defendants believed the change in
policy would result in a substantial risk of harm to plaintiff or
other inmates. Indeed, the opposite is true; the evidence shows
that defendants believed that, given the rise in violence, the no
restraint recreation policy posed more of a risk of serious harm
to inmates than the more restrictive restraint policy. See
Johnson v. Ruiz, Civ. No. 11cv542 (JCH), 2012 WL 90159 (D. Conn.
Jan. 10, 2012) ("Under Farmer v. Brennan, 511 U.S. 825 (1994),
prison officials have a duty to make reasonable efforts to ensure
inmate safety. This duty includes protecting inmates from harm at
the hands of other inmates"). This conclusion is buttressed by
the fact that the policy was originally changed to allow
recreating inmates to be handcuffed in front, and made more
restrictive after inmates used the handcuffs to assault staff. As
such, plaintiff failed to satisfy the subjective element.

*Qualified Immunity*

Even if plaintiff had adduced enough evidence to meet his burden of proving an Eighth Amendment violation, the defendants would be entitled to qualified immunity on this claim. The doctrine of qualified immunity protects government official from civil suits arising from the performance of their discretionary functions when (1) their conduct does not violate clearly established constitutional rights, or (2) it was objectively reasonable for them to believe their acts did not violate those rights. See Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982); Lennon v. Miller, 66 F.3d 416, 420-21 (2d Cir. 1995).

There is no evidence from which the Court could conclude that the defendants knew that the change in policy would violate plaintiff's rights. On the contrary, the evidence shows that in response to a security and safety emergency, defendants considered several options and decided on the policy in question because it allowed inmates to recreate while at the same time achieving the necessary security and safety. Most importantly, the evidence established that defendants consulted with the Attorney General's office prior to implementing the restraint policy and received approval from Assistant Attorney General Terry O'Neil. See Def's Ex. 515, Memo from Warden Quiros to Deputy Commissioner Strange, dated October 1, 2009, stating in part, "These policy changes and [have] been reviewed and approved

29

by Assistant Attorney General Terry O'Neil." Having consulted with and relied on an opinion from the Attorney General's office, it was objectively reasonable for the defendants to believe that their actions did not violate plaintiff's rights. See Oliveira v. Mayer, 23 F.3d 642, 648-49 (2d Cir. 1994). Therefore, qualified immunity serves as an additional basis for the entry of judgment in favor of the defendants.

III. CONCLUSION

The Court finds that plaintiff failed to prove that defendants subjected him to conditions of confinement constituting cruel and unusual punishment in violation of the Eighth Amendment by adopting and implementing a policy requiring SRGSTM Phase I inmates to recreate in handcuffs.

Accordingly, judgment is entered in favor of defendants on all counts.

This is not a recommended ruling.  The parties consented to proceed before a United States Magistrate Judge [doc. # 21] on August 23, 2011, with appeal to the Court of Appeals.

ENTERED at Bridgeport this 29th day of September 2012.

                              /s/
                              _____
                              HOLLY B. FITZSIMMONS
                              UNITED STATES MAGISTRATE JUDGE